## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4950 | **DATE** | October 30, 2003 |
| **CASE TITLE** | JCW v Novelty | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Hearing

(5) ☒ Status hearing set for 11/6/03, at 9:00 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ☒ [Other docket entry] **Memorandum opinion and order entered. Accordingly, plaintiff's motion for summary judgment of copyright infringement is granted.**

(11) ☒ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| X | Notices mailed by judge's staff. | | NOV 0 6 2003 | | |
| | Notified counsel by telephone. | | date docketed | | 70 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| GDS | courtroom deputy's initials | U.S. DISTRICT COURT | date mailed notice | | |
| | | 03 NOV -5 PM 2:14 | Date/time received in central Clerk's Office | mailing deputy initials | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JCW INVESTMENTS, INC., d/b/a Tekky Toys,<br><br>      Plaintiff,<br><br>    v.<br><br>NOVELTY, INC.,<br><br>      Defendant. | )<br>)<br>)<br>)   No.   02 C 4950<br>)<br>)   Judge Robert W. Gettleman<br>)<br>)<br>) |

**DOCKETED**
**NOV 0 6 2003**

## MEMORANDUM OPINION AND ORDER

In its amended complaint, plaintiff JCW Investments, Inc. ("Tekky Toys") seeks

injunctive and monetary relief against defendant Novelty, Inc. ("Novelty"), alleging that

defendant's farting dolls, Fartman and Fartboy, infringe, 1) its copyright on its doll, "Pull My

Finger Fred," in violation of 17 U.S.C. §§ 106 and 501 (Count I)[1], and 2) its trademark in "Pull

My Finger Fred" in violation of the Lanham Act, 15 U.S.C. § 1114(1) (Count II). Plaintiff also

asserts claims of unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count

III), trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c) (Count IV), common

law unfair competition (Count V), and violation of the Illinois Uniform Deceptive Trade

Practices Act, 815 ILCS 510/2 (Count VI). Defendant counterclaims for cancellation of

plaintiff's trademark on Pull My Finger Fred pursuant to 15 U.S.C. § 1064.

On June 30, 2003, pursuant to Federal Rule of Civil Procedure 56, defendant moved for

summary judgment on plaintiff's copyright infringement claim, arguing that, (1) plaintiff's

copyright is invalid because of improper authorship, and (2) defendant's acts do not constitute

---

[1]In a memorandum opinion and order dated September 20, 2002, <u>JCW Investments, Inc.
v. Novelty, Inc.</u>, 222 F. Supp. 2d 1030 (N.D.Ill. 2002) ("Tekky Toys I"), the court granted
plaintiff's motion for a preliminary injunction based on its copyright claim.

70

copying. Plaintiff has cross-moved for summary judgment of copyright infringement. For the reasons stated below, the court grants plaintiff's motion and denies defendant's motion.

## FACTUAL BACKGROUND[2]

Plaintiff Tekky Toys is an Illinois corporation with its principal place of business in Orland Park, Illinois. Tekky Toys designs and sells novelty items, including a plush toy character called "Pull My Finger Fred" ("Fred"), which was developed in 1997.

Fred[3] is a plush toy figure of a smiling, black-haired, balding, Caucasian man in a white tank top, blue pants, and brown shoes with black bottoms, sitting in a green chair. When Fred is activated by pinching a red sticker marked "Press Here" on the protruding finger of his right hand, Fred emits flatulence-like sounds, his chair vibrates, and he jokes about the sound he just made (for example, by saying, "Silent, but deadly," and "Did somebody step on a duck?"). A close visual inspection of Fred reveals that he has eyes with annular retinas, large nostrils, and a wavy smile that reveals five upper teeth and two lower teeth. Fred also has a line under the right side of his mouth, and his hair extends slightly in front of his ears.

In or around 1997, James Wirt and Geoff Bevington began working together on developing drawings of Fred. The inspiration for these drawings was drawn from the imagination and personal experiences of both Bevington and Wirt. Wirt sent one of Bevington's drawings to Peter MacKennan ("MacKennan"), a three-dimensional character designer who was not an employee of Tekky Toys. Wirt hired MacKennan to make a three dimensional pattern and

---

[2]Unless otherwise noted, the following facts are not in dispute and were taken from the parties' Local Rule 56.1 statements and exhibits attached thereto.

[3]The court has viewed exemplars of Fred, Fartman and Fartboy; their photographs are attached as an appendix.

prototype sculpture from one of Bevington's drawings. Using a Bevington drawing and an instruction by Wirt as to how big the plush sculpture should be, MacKennan made a pattern and a prototype sculpture of Fred. From his work, MacKennan never intended to be a co-author or co-owner of any copyright in Fred, and on January 9, 2003, he executed a declaration to this effect.

Mark MacLean was the "voice talent" for the sound recording utilized for Fred. Wirt and Bevington provided MacLean with a list of phrases to read using different voices. While neither Wirt's nor Bevington's voice was actually used in the sound recording, MacLean provided different voices as directed by Wirt.[4] From these different recordings, Wirt selected which of these voice recordings would ultimately be used for Fred.

Wirt then submitted the pattern and prototype made by MacKennan along with a Bevington drawing to at least two toy manufacturers in Asia (the "Asian manufacturers"). With these materials the Asian manufacturers made many different prototypes and production models of Fred. After reviewing these prototypes, Bevington and Wirt made various revisions. For example, Wirt's revisions included increasing the size of the eyes, eyebrows, and stomach, and changing the mouth and the orientation of the audio trigger. Although some minor differences existed between the specifications sent to the Asian manufacturers and the final dolls (for

---

[4]In his deposition, MacLean testified as follows:
Q: ... When he gave you this list of phrases to say, did he give you any instructions along with that?
A: Oh, sure. He would direct me to the type of voice he wanted me to use.
Q: And how would he direct you?
A: He would say try a higher voice, do a lower voice, make it more gruff or try and make him sound fatter or make him sound friendlier, or you know, put a little laugh at the end of this phrase, things like that.

3

example, Fred's hair is made of plush in the final doll), these changes were submitted to and approved by Wirt.

Wirt and Bevington applied for a copyright registration with the United States Copyright Office for a "plush toy with sound" for their 3-dimensional sculpture and sound recording. The copyright registration form stated that Wirt and Bevington were the only "co-authors" of Fred. Wirt also submitted a production unit of Fred made by one of the Asian toy manufacturers to the United States Copyright Office. The Registrar of Copyrights received the application and on February 5, 2001, Bevington and Wirt obtained Certificate of Copyright Registration No. SRu434-019 for Fred. The Asian manufacturers were directed to place the copyright designation "©" on the cardboard box container of the Fred doll. Wirt and Bevington assigned their copyright rights to Tekky Toys on July 11, 2002.

Defendant Novelty is a privately held Indiana corporation. Defendant is in the business of selling novelty items, including the plush toy Fartman[5] that is at the heart of the instant dispute. Its principal place of business is in Greenfield, Indiana, and it is owned entirely by its President, Todd Green ("Green").

Green testified at his deposition that he first saw Fred at a showroom for TL Toys in Hong Kong, one of the Asian manufacturers of Fred (although he could not remember when). Green also admitted that his idea for Fartman was based on Fred.

---

[5]Defendant also manufactures Fartboy, a miniaturized version of Fartman whose flatulence and joking are activated by pulling his disproportionately large plastic finger out on a string. Plaintiff submits that for the purposes of the instant motion "Fartman" should be read to include both Fartman and Fartboy. Defendant has not objected to treating the two dolls collectively and, in fact, states in its own brief that "FARTMAN refers generally to FARTMAN AND FARTBOY, unless otherwise indicated." Accordingly, for the purposes of the instant motion, "Fartman" will include both Fartman and Fartboy.

4

Fartman is a plush doll of a smiling, black-haired, balding Caucasian man, wearing a white tank top with "Fartman" emblazoned across the front in red capital letters, a red baseball cap with a large "F" on the front (worn backwards), blue pants, and white tennis shoes with black laces and white bottoms, sitting in a brown vinyl chair. When Fartman is activated by pinching a red sticker marked "Press Here" on the protruding finger of his right hand, he emits flatulence-like sounds, his chair vibrates, and he jokes about the sound he just made (for example, by saying, "Silent, but deadly," "Did somebody step on a duck?" as well as "Rip-it-y-do-dah!"). A close visual inspection of Fartman reveals that he has eyes with solid retinas, no nostrils, and a wavy smile revealing five teeth. Fartman is slightly larger than Fred and his voice is similar to Fred's.

Green described his Fartman idea to Mary Burkhart ("Burkhart"), the art director at Novelty, who quickly prepared a single drawing based on Green's Fartman idea. Although Burkhart testified at her deposition that she could not remember the actual words or specific instructions Green used in describing his Fartman idea, she testified that he described a "kind of a hillbilly-type guy, sitting in a chair that would fart and be activated by actually pulling his finger." Burkhart further testified that she did not see Fred until January 7, 2003, as part of this litigation.

Green and Burkhart were the only Novelty employees involved in the development of Fartman. According to the general practice at Novelty, Burkhart would have shown her drawings to Green for his input and approval, after which the drawing would be put into a JPEG form so that the manufacturer could understand the specifics of how the toy was to look. Once the JPEG drawing was approved by Green, it was supplied to Gtig, a third-party toy manufacturer, so that

5

Gtig could make a prototype of Fartman for Novelty's review.[6] Gtig made samples of Fartman, and Novelty directed Gtig to change the first sample to comport with the JPEG drawing.

On October 8, 2001, Novelty began selling its "Pull My Finger Santa" product, a farting Santa doll which is not seated in a chair. Novelty began selling Fartman on November 5, 2001. In March 2002, plaintiff learned that defendant was selling Fartman.

The "pull-my-finger" gag, which involves an individual reaching out and asking someone else to pull his finger and passing gas when his finger is pulled, did not originate with plaintiff or the defendant. Neither did the sayings "did somebody step on a duck" nor "silent but deadly." The recorded history of the "pull-my-finger" joke appeared as early as 1887 in Emile Zola's book The Earth. A reference to a doll performing the "pull-my-finger" gag surfaced in 1997 when radio personalities Bob and Tom released an album, "FUNHOUSE," which contained a previously broadcast comedy sketch entitled "Pull My Finger Charlie." The "Pull My Finger Charlie" sketch describes a hypothetical toy doll that farts and jokes, "Did someone step on a duck?" when its finger is pulled. However, the "Pull My Finger Charlie" track does not describe an actual toy or any physical characteristics of a toy that was actually sold to consumers.

## LEGAL STANDARD

A moving party is entitled to summary judgment under Rule 56 when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993), cert. denied, 510 U.S. 1121

---

[6]No separate drawings were done for Fartboy.

(1994). Once the movant has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. O'Connor v. DePaul University, 123 F.3d 665, 669 (7th Cir. 1997).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Chicago Board of Education v. Substance, Inc., 2002 U.S. Dist. LEXIS 15036, at *6 (N.D. Ill. 2002). "The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient; there must be evidence in which a jury could reasonably find for the nonmoving party." Anderson, 477 U.S. at 252.

## DISCUSSION

Defendant argues that plaintiff does not own a valid copyright because Wirt and Bevington were not the actual authors of the Pull My Finger Fred sound recording and 3-D sculpture. Defendant also argues that its acts did not constitute copying because, 1) there was no substantial similarity between Fartman and what constituted the protectible expression of plaintiff's copyright, and 2) defendant did not have access to Fred, and Fartman was independently created.

In response, plaintiff argues that Wirt and Bevington are the sole co-authors of the Pull My Finger Fred sound recording and 3-D sculpture. Plaintiff also argues that defendant had

7

access to Fred and made a substantially similar copy of Fred, infringing plaintiff's expression which was protected by plaintiff's copyright.

## A. <u>VALIDITY</u>

To establish a claim of copyright infringement, a plaintiff must show, (1) ownership of a valid copyright, and (2) "copying" of the original constituent elements of the work. <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.</u>, 499 U.S. 340, 361 (1991); <u>Susan Wakeen Doll Co., Inc. v. Ashton-Drake Galleries</u>, 272 F.3d 441, 450 (7th Cir. 2001).

"A certificate of registration from the U.S. Register of Copyrights constitutes *prima facie* evidence of the validity of a copyright." <u>Wildlife Express Corp. v. Carol Wright Sales, Inc.</u>, 18 F.3d 502, 507 (7th Cir. 1994). If the plaintiff produces a certificate of copyright, a rebuttable presumption of validity exists and the burden shifts to the defendant to prove why the copyright is invalid. <u>Marobie-FL, Inc. v. Nat'l Assoc. of Fire Equip. Distr.</u>, 2000 WL 1053957, at *3 (N.D. Ill. 2000); <u>LZT/Filliung Partnership, LLP v. Cody/Braun & Assoc., Inc.</u>, 117 F. Supp. 2d 745, 750 (N.D. Ill. 2000); <u>Pickett v. Prince</u>, 52 F.Supp. 2d 893, 900 (N.D. Ill. 1999), remanded on other grounds, 207 F.3d 402 (7th Cir. 2000).

Plaintiff has presented a copy of the copyright registration certificate for Fred, and it is undisputed that plaintiff is the owner of the copyright to Fred. Thus, plaintiff is entitled to a rebuttable presumption of validity as to its copyright in Fred. See <u>Marobie-FL, Inc.</u>, 2000 WL 1053957, at *4. In an attempt to rebut this presumption of validity, defendant claims that Wirt

and Bevington are not the authors of either the sound recording or the 3-dimensional sculpture of Fred.[7]

The Copyright Act of 1976 provides that copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection. 17 U.S.C. § 102. Ideas, refinements, and suggestions, standing alone, are not the subject of copyrights. An author provides more than direction or ideas by translating his idea into a fixed, tangible expression, but an important indicator of authorship is a contributor's decision-making authority over what changes are made and what is included in a work. Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1071-72 (7th Cir. 1994).

An author exercises "artistic control" over the work and acts as the inventor or "master mind." Aalmuhammed v. Lee, 202 F.3d 1227, 1233 (9th Cir. 2000). The creator of a work at another's direction, without contributing intellectual modification, is not an author. Lakedreams v. Taylor, 932 F.2d 1103, 1108 (5th Cir. 1991). A court may find individuals are coauthors if they made objective expressions of a shared intent to be coauthors. See Aalmuhammed, 202 F.3d at 1234.

--------------------------------------------------

[7]Neither defendant nor plaintiff asserts that Fred is a "work-for-hire," presumably because, (1) both parties agree that MacKennan, MacLean, and the Asian manufacturers were not Tekky Toys employees, and (2) neither the sound recording nor the 3-D sculpture is one of the types of works that fits within any of the nine categories of "specially ordered or commissioned" works that may be considered works for hire. See, e.g., Community for Creative Non-violence v. Reid, 490 U.S. 730, 736 (1989); Staggers v. Real Authentic Sound, 77 F. Supp.2d 57,64 (D.D.C. 1999).

## 1. The Sound Recording

The Copyright Act of the United States defines sound recordings as "works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work." 17 U.S.C. § 101. The author of a sound recording is the performer(s) or record producer or both. 1 Melvin B. Nimmer, Nimmer on Copyright § 2.10[A][2][b], at 2-172.5 to 172-6 (2001). A record producer may be an author when he or she is "responsible for setting up the session, capturing and electronically processing the sounds, and compiling and editing them to make a final sound recording." See Systems XIX, Inc. v. Parker, 30 F.Supp. 2d 1225, 1228 (N.D. Cal. 1998) (quoting H.R.Rep. No. 94-1476, 94th Cong., 2nd Sess. 56 (1976)).

It is undisputed that Wirt and Bevington provided MacLean with the list of phrases that were used in the sound recording of Fred. While neither Wirt's nor Bevington's voice was used in the sound recording, Wirt set up the session and directed MacLean to use different types of voices in the recording studio. From these different recordings, Wirt personally selected which of these voice recordings would ultimately be used for Fred. This evidence establishes Wirt's independent thought and creativity in the selection as well as the arrangement of the sounds to used in Fred. Defendant has failed to raise genuine issues of fact to contradict either Wirt's and Bevington's authorship or MacLean's alleged lack of authorship of the sound recording portion of its copyright.

Defendant's passing contention that Bevington may not be a joint author of Fred because he was not involved in the production of Fred's sound recording is also unsupported. Defendant correctly asserts that to be a joint author, 1) the parties must have intended to be joint authors at

10

the time the work was created, and 2) each alleged author's contribution must be "independently

copyrightable." See, e.g., Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1070-1071 (7th Cir.

1994). However, this does not mean that both Bevington and Wirt had to contribute jointly to

both the sound recording and the 3-D sculpture of Fred. The relevant inquiry is whether either

Wirt or Bevington is a co-author in the copyrighted work as a whole. See 17 U.S.C. § 101

(defining joint work as "a work prepared by two or more authors with the intention that their

contributions be merged into inseparable or interdependent parts of a unitary whole."). Because

the record reflects that both Wirt and Bevington intended to be joint authors of a unitary whole,

and defendant has not provided evidence to the contrary, the presumption of validity of plaintiff's

copyright and authorship in the sound recording of Fred has not been rebutted.

## 2. The 3-D Sculpture

Defendant contends that MacKennan, or alternatively one of the Asian manufacturers, as

independent artists not employed by plaintiff, is the author of the 3-dimensional sculpture of Fred

as a derivative work. A derivative work is defined as "a work based upon one or more pre-

existing works, such as... art reproduction ... or any other form in which a work may be recast,

transformed, or adapted." 17 U.S.C. § 101. However, in order to qualify as a derivative work,

that work must comprise an original artistic addition to the underlying design. Gracen v.

Bradford Exchange, 698 F.2d 300, 302 (7th Cir.1983). The Seventh Circuit applies the

"substantially different" test as to whether a derivative work is separately copyrightable.

Bradford Exchange, 698 F.2d at 303.

In response to defendant's derivative works argument, plaintiff contends that

"defendant's faulty reasoning [would create] an endless series of 'derivative works' in the form

11

of sketches, patterns, mock-ups, etc., as one moved through the process of creating a final work."
According to plaintiffs, the 3-dimensional models of Fred produced by MacKennan and the
Asian manufacturers are not substantially different from the drawings provided by Bevington and
Wirt. Further, plaintiff maintains that Wirt's and Bevington's creative control establishes their
exclusive authorship of the 3-D sculptural expression of Fred.

"To support a copyright there must be at least some substantial variation, not merely a
trivial variation such as might occur in the translation to a different medium." L. Batlin & Son,
Inc. v. Snyder, 536 F.2d 486, 491 (2d Cir. 1976). On this issue, Saturday Evening Post Co. v.
Rumbleseat Press, Inc., 816 F.2d 1191, 1193 (7th Cir 1987), relied on by defendant, is inapposite.
The issues before the court in Saturday Evening Post were whether copyright validity was
arbitrable and whether a no-contest clause relating to copyright validity was against public
policy. Because the plaintiff had granted the defendant in that case an exclusive license to make
derivative works, the issue of substantial difference was not addressed by the court.

Durham Industries, Inc. v. Tomy Corp., 630 F.2d 905, 909 (2d Cir.1980), is more relevant
to the instant dispute. The underlying works in that case were 2-dimensional drawings of Mickey
Mouse and other Walt Disney cartoon characters, and the alleged derivative works were plastic
reproductions of them. In concluding that the plastic reproductions did not qualify as derivative
works worthy of copyright protection, the court noted that "the mere reproduction of the Disney
characters in plastic, even though the adaptation of the preexisting works to this medium
undoubtedly involved some degree of manufacturing skill, does not constitute originality as this
Court has defined the term." Id. at 910.

12

Like the defendant in <u>Durham</u>, McKennan simply converted a two-dimensional design into a three-dimensional object, without sufficient original artistic contribution. There is no dispute that MacKennan made a pattern and a prototype sculpture of Fred using a Bevington drawing and an instruction by Wirt as to how big the plush sculpture should be. <u>Compare Kyjen Co., Inc. v. Vo-Toys, Inc.</u>, 233 F. Supp.2d 1065 (C.D.Cal. 2002) (finding that a company owned a valid copyright where the assigning author provided a manufacturer with a sketch and instructions and the toy generally reflected the original sketches) with <u>Nadel & Sons Toy Corp. v. William Shaland Corp.</u>, 1989 WL 135873 (S.D.N.Y. 1989) (finding that a company was not an author where the assigning individual provided the manufacturer only with the type of animal it wanted the manufacturer to design without providing a sketch, any instruction, or deciding any of the original design features, and individual was an independent artist who determined all the works' features).

A visual comparison reveals that MacKennan's prototype is a faithful translation of Bevington's drawing. Moreover, defendant has provided no evidence to contradict plaintiff's contention that Wirt supervised MacKennan's sculpture, and that whatever differences exist between the sketches and finished product were directed by Wirt to ensure that this first prototype best matched Wirt's and Bevington's original design. There is simply no evidence suggesting that MacKennan exercised any creative control over the Fred prototype.

Similarly, the Asian manufacturers' translation of MacKennan's prototype and pattern into the final Fred product was devoid of original artistic contribution. Wirt transmitted Bevington's drawing, MacKennan's prototype based on Bevington's drawing, and Bevington's and Wirt's instructions to the Asian manufacturers. After Wirt reviewed the first prototypes made

13

by the Asian manufacturers, he reviewed and approved the necessary changes and gave instructions to the manufacturers so that the product met Bevington's and Wirt's expectations. To the extent that the final Fred product differed from MacKennan's pattern or prototype or Bevington's drawings, all changes were submitted to and approved by Wirt. The Asian manufacturers did not participate in designing the toy patterns or exercise any creative control over the designs. The undisputed evidence shows the final Fred product generally reflects Bevington's original design and MacKennan's prototype, as well as the direction provided by Wirt and Bevington.

The undisputed facts establish that neither the final Fred doll produced by the Asian manufacturers, nor MacKennan's prototype, constitute derivative works worthy of copyright protection. The court thus concludes that Bevington and Wirt were indeed the authors of the 3-dimensional sculpture of Fred, as well as Fred's sound recording, and that their copyright is valid.

## B. COPYING

Having concluded that plaintiff is the owner of a valid copyright, the court focuses its attention on the second element of plaintiff's copyright infringement claim: copying of constituent elements of Fred that are original. See Susan Wakeen Doll Co., Inc. v. Ashton-Drake Galleries, 272 F.3d 441, 450 (7th Cir. 2001). Copying may be inferred when, (1) the defendant had access to a copyrighted work, and (2) the accused work is substantially similar to the copyrighted work. Id. The inference of copying drawn from access and substantial similarity may be rebutted by proof of independent creation, however. Id. A defendant independently

14

created a work if it created its own work without copying anything or if it copied something other than the plaintiff's copyrighted work. Id.

1. Access

Access is shown where the defendant had an opportunity to view the copyrighted item. Wildlife Express Corp. v. Carol Wright Sales, Inc., 18 F.3d 502, 508, n.5 (7th Cir. 1994). At his deposition, Green testified that he saw Fred at a showroom for TL Toys before coming up with his ideas for Fartman and Fartboy, and further conceded that his idea for Fartman was based on Fred.

Rather than attempting to refute the facts relating to Green's access to Fred, defendant maintains that "legally there was no 'access,' since the ultimate goal of the 'access' inquiry is to determine whether protectible expression was copied, and [Mary Burkhart, defendant's art director,] never had access to, and thus could not have copied, Pull My Finger Fred's expression." In response, plaintiff maintains that access may be imputed to Burkhart through the "corporate receipt doctrine." See, e.g., Le Moine v. Combined Communications Corp., 1996 WL 332688, at *4 (N.D.Ill. June 13, 1996) (reasonable probability of access may be inferred when there is a close relationship or nexus between the alleged copier and the individual possessing knowledge of the creator's work); Moore v. Columbia Pictures Industries, Inc., 972 F.2d 939, 944-945 (8th Cir. 1992) (same). A "key feature" of the corporate receipt doctrine is whether "the person who had viewed plaintiff's work and was therefore in a position to transmit it to the copier, either was a supervisor with responsibility for the defendant's project, was part of the same work unit as the copier, or contributed creative ideas or material to the defendant's work."

Id. at 944. In light of the extensive oversight Green exercised over Burkhart's development of Fartman, the court concludes that access should be imputed to Burkhart in the instant case.

Defendant does not dispute that Todd Green, defendant's president, is the primary source of its product ideas. Based on Green's description of his Fartman idea (which Green testified was based on Fred), Burkhart made a drawing of what Fartman would look like. Although Burkhart testified at her deposition that she could not remember the actual words or specific instructions that Green used to describe the Fartman idea, she testified that he described a "kind of a hillbilly-type guy, sitting in a chair that would fart and be activated by actually pulling his finger."

Burkhart acknowledged that "general practice" at Novelty would require her to show the Fartman drawings to Green for his input and approval. Once the Fartman drawings were approved by Green, they were placed in a JPEG file and sent to Gtig for manufacture. Green and Burkhart were the only employees of defendant who were involved in the development of Fartman.

These undisputed facts relating to Green's oversight and ultimate approval of Burkhart's work on Fartman compel the inference that Burkhart had access to Fred under the corporate receipt doctrine. The court thus concludes that defendant's argument that it had no access to Fred lacks any foundation and is not credible, and no reasonable jury could find otherwise.

## 2. Substantial Similarity

The Seventh Circuit applies the "ordinary observer" test to assess substantial similarity. Susan Wakeen Doll Co., 272 F.3d at 451. Under that test, the court asks "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that

the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value." Id. (quoting Wildlife Express Corp. v. Carol Wright Sales, Inc., 18 F.3d 502, 508 n.5 (7th Cir. 1994)). Thus, "two works are substantially similar if 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same.'" Wildlife Express Corp., 18 F.3d at 509 (quoting Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960)). Differences of minor importance in the overall artistic expression of two works do not preclude a finding of infringement under the ordinary observer test. Id. at 511.

As a threshold matter, the court notes that application of the ordinary observer test must take into account that copyright protection extends only to the particular expression of an idea and never to the idea itself. Atari, Inc. v. North American Philips Consumer Electronics Corp., 672 F.2d 607, 615 (7th Cir. 1982) (quoting Reyher v. Children's Television Workshop, 533 F.2d 87, 90 (2d Cir. 1976)). As Judge Learned Hand observed, "Obviously, no principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be ad hoc." Peter Pan Fabrics, Inc., 274 F.2d at 489.

In Tekky Toys I, this court held that the idea underlying Fred was that of a "farting doll" and that "Pull My Finger Fred" was but one expression of that idea. Defendant maintains that this definition of the idea behind Fred is overly simplistic, and submits that the non-protectible idea underlying Fred is that of "a plush doll of a typical man wearing jeans and a T-shirt in a chair doing the 'pull my finger' joke." This proffered definition is overly narrow and self-serving. As Judge Grady observed in Tensor Group, Inc. v. Global Web Systems, Inc., 1998 WL

887081, at \*3 (N.D.Ill. Dec. 11, 1998) (quoting <u>Midway Mfg. Co. v. Bandai-America, Inc.</u>, 546

F. Supp. 125, 148 (D.N.J. 1982)):

> A copyright defendant could always avoid liability merely by describing a plaintiff's toy
> in great detail and then labeling that description the "idea" of plaintiff's toy. The "idea"
> of any toy could always be defined in such detail that the description of the expression
> would add nothing to the "idea," thus allowing a defendant to engage in all but verbatim
> copying. Such a ploy cannot be allowed.

The court thus declines to adopt defendant's proposed definition of the idea behind Fred,

which would essentially permit defendant to copy Fred with impunity. Having said that, with the

benefit of extensive briefing by both parties, the court has revisited its prior definition of the idea

behind Fred and concluded that a more appropriate definition would be that of a plush doll that

makes a farting sound and articulates jokes when its finger is activated. Fred - a smiling, black-

haired, balding Caucasian male, wearing a white tank top and blue pants, reclining in a green

armchair, who makes a farting sound, vibrates and utters phrases such as "Did somebody step on

a duck?" and "Silent but deadly" after the protruding finger on his right hand is pinched - is

plaintiff's expression of that idea.

Defendant attempts to narrow plaintiff's protectible expression by arguing that, (1) any

features shared by Fred and Fartman are not original and not protectible because they are derived

from antecedent sources, such as Emile Zola's character, Jesus-Christ, in <u>The Earth</u>, and the

"Pull My Finger Charlie" track on the 1997 Bob and Tom FUNHOUSE album; (2) "it is standard

to stereotype an adult [who] finds humor in farting and joking about it as having a low socio-

economic status [and] [p]ortraying a character as overweight, balding and wearing blue jeans and

a white undershirt with no overshirt is a stereotypical way of depicting adult characters of low-

socioeconomic status"; and (3) Fred's chair, hairline and smile were dictated by functional or

utilitarian concerns. For the reasons outlined below, the court concludes that defendant's arguments are without merit.

a. Antecedent Sources

Defendant cites to <u>Alexander v. Haley</u>, 460 F. Supp. 40, 44-45 (S.D.N.Y. 1978), for the proposition that "where common sources exist for the alleged similarities, or the material that is similar is otherwise not original with the plaintiff, there is no infringement." <u>See also</u> <u>FASA Corp. v. Playmates Toys, Inc.</u>, 912 F. Supp. 1124, 1171 (N.D.Ill. 1996). Defendant then identifies the Jesus-Christ character depicted in Emile Zola's 1887 novel <u>The Earth</u>, and the "Pull My Finger Charlie" track on the 1997 Bob and Tom's FUNHOUSE CD as two antecedent sources that contain the features shared by Fred and Fartman (and thus render those features unprotectible).

Jesus-Christ, according to the excerpt from <u>The Earth</u> provided by defendant,

> never let one fly without blurting out some joke or other as well. He despised timid little squeaks, smothered between the cheeks, squirting out uneasily and ashamedly. He never emitted anything but frank detonation, substantial and ample as cannon shots. Whenever he raised his leg and settled himself with a comfortable and tactical motion, he called his daughter in tones of urgent command, with a grave expression on his face.
> "La Trouille, hurry, for God's sake!"
> She rushed up and the blast went off point blank with such a vibrating energy that she gave a jump.
> "Run after it. Get hold of it between your teeth and see if there's any knots in it!"
> At other times, as soon as she reached him he would give her his hand. "Pull hard, draggle-tail! Make it go off with a bang!"

The excerpt provided by defendant does not describe the physical appearance of Jesus-Christ, such as his hairline or clothing. Aside from the fact that Fred farts and jokes when his finger is pulled, and Jesus-Christ farts and jokes when his entire hand is pulled, the court fails to

19

see any meaningful similarities[8] between Jesus-Christ and Fred. Defendant's argument that Fred is "remarkably similar to" Zola's Jesus-Christ borders on frivolous.

Defendant's reliance on the "Pull My Finger Charlie" track on the Bob and Tom FUNHOUSE CD is equally misplaced. The "Pull My Finger Charlie" track described a hypothetical toy that, like Fred, farted and joked when its finger was pulled, and said two of the same phrases as Fred ("Silent but deadly" and "Did somebody step on a duck?"). That is where the similarities end, however. The "Pull My Finger Charlie" track did not describe the physical appearance of the hypothetical toy described therein, including his attire, his hairline, his build, and whether he was standing or sitting. Defendant's argument that the court should narrow the scope of plaintiff's protectible expression on the basis of The Earth and the "Pull My Finger Charlie Track" is wholly without merit.

b.   Scenes A Faire

Defendant's argument that the features shared by Fred and Fartman are "scenes a faire" is similarly unpersuasive. "Scenes a faire" refers to "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." Atari, 672 F.2d at 616 (quoting Alexander v. Haley, 460 F. Supp. 40, 45 (S.D.N.Y. 1978)). "Thus, similarity of expression, whether literal or nonliteral, which necessarily results from the fact that the common idea is only capable of expression in more or less stereotyped form will preclude a

---

[8] That Jesus-Christ has a daughter and Fred's press release describes him as an uncle or father is of no consequence. Even if the court defined Fred's idea as that of an uncle or father (and thus an older male), plaintiff's expression of that idea - a black-haired, balding male, reclining in an armchair, wearing a white tank top and blue pants - would still be original to plaintiff, notwithstanding Zola's Jesus-Christ character.

finding of actionable similarity." Id. (quoting 3 M. Nimmer, Nimmer on Copyright §

13.03(A)(1), at 13-28 (1981)).

To begin, defendant's assertion that it is "standard" to stereotype a character that finds

humor in farting and joking about it as having low socioeconomic status is mere conjecture,

unsupported by any evidence (empirical or otherwise) in the record. This court also finds

defendant's argument more than a bit insulting and condescending. Defendant directs the court's

attention to excerpts from Jim Dawson's Who Cut the Cheese? A Cultural History of the Fart,

Ten Speed Press (1999), as evidence that "'fart jokes' have long been popular 'among the lower

classes' and 'poor people.'" Assuming arguendo that this proposition is true, however, does not

dictate that it is "standard" to depict a farting character as having low socioeconomic status.

Moreover, even assuming the truth of such a proposition, it is by no means "standard,"

much less indispensable, to depict a person of low socioeconomic status as balding, wearing a

white tank top and blue jeans, and reclining in an armchair.[9]   The idea behind Fred, a plush doll

that makes a farting sound and jokes when its finger is activated, is not "only capable of

expression in more or less stereotyped form." See Atari, 672 F.2d at 616. To the contrary, the

idea behind Fred could just as easily have been expressed by a standing doll (such as defendant's

Pull My Finger Santa toy), or one that wore clothing other than a white tank top and blue jeans,

one with facial hair, or one with a full head of hair. The scenes a faire doctrine does not apply to

the instant case.

---

[9]Bevington's reference to the comfy chair pose as being the "classic pose" in his character
study of Fred was for internal purposes only and by no means establishes that use of a comfy
chair was indispensable in expressing Fred's idea.

21

<u>c.</u>    <u>Functional/Utilitarian Concerns</u>

Features dictated by primarily utilitarian considerations, such as the levers and buttons of

a game that make the games work, are not protected by copyright. <u>See</u> <u>Durham Industries, Inc. v.</u>

<u>Tomy Corp.,</u> 630 F.2d 905, 915 (2d Cir. 1980). To this end, defendant maintains that several

features shared by Fred and Fartman, including their hairlines, wavy smiles, and seated positions,

were dictated by utilitarian concerns and thus do not constitute protectible expression. The court

disagrees.

Contrary to defendant's contention, Fred's and Fartman's hairlines were not "outside the

control of [the parties]." Rather, Fred's manufacturer merely changed his hair from felt to a

plush material. As plaintiff points out, "Whether felt or plush was used as material has nothing

to do with the shape, style and position of [Fred's] hairline." As for defendant's control over

Fartman's hairline, the drawings indicate that Fartman's hairline is consistent with the JPEG

drawings that defendant submitted to its manufacturer, Gtig.

Nor are Fred's and Fartman's "wavy" smiles dictated by having to meander around a

seam. Bevington testified at his deposition that Fred's smile was his own cartooning style ("I

was glad it would fit the way the seams are. I tried to put in Fred's expression my cartoon

style."), and defendant has not provided any evidence to the contrary. Further, a visual

inspection of Fartman indicates that his smile need not be "wavy" in order to avoid the two

seams of his own chin.

Last, defendant's argument that utilitarian concerns dictated placing the doll in a chair is

contradicted by defendant's "Pull My Finger Santa" toy, which is standing rather than seated in a

chair. Defendant's Pull My Finger Santa toy was developed and manufactured

22

contemporaneously with Fartman, and in fact was first sold prior to Fartman. Thus, in contrast to the levers and buttons in <u>Durham Industries, Inc.</u>, 630 F.2d at 915, placing Fartman's and Fred's characters in chairs was not required to make the toys work. Defendant's attempts to narrow Fred's protectible expression are thus wholly unpersuasive.

Looking at the dolls side-by-side, it is clear that any ordinary reasonable person would conclude that defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value. See <u>Susan Wakeen Doll Co.</u>, 272 F.3d at 451 (quoting <u>Wildlife Express Corp.</u>, 18 F.3d at 508 n.5). No reasonable jury could find to the contrary.

As the court noted in <u>Tekky Toys I</u>, whatever differences exist among Fred and Fartman pale in comparison to their overwhelming similarities. Both Fartman and Fred are Caucasian, black-haired, balding males (with nearly identical hairlines), seated in armchairs, wearing blue pants and white tank tops. Both toys are activated by pinching a protruding finger on their right hands (clearly marked "press here"). Both toys vibrate when activated. Both toys have wavy smiles that reveal their teeth.

The most obvious physical differences between the toys are as follows: Fartman wears a hat, whereas Fred does not; Fartman's white tanktop has "Fartman" emblazoned across the front, whereas Fred's white tanktop is blank; Fartman's shoes are white with laces and Fred's shoes are brown with black bottoms. With respect to the phrases each toy utters, Fartman and Fred both say, "Did somebody step on a duck?" and "Silent, but deadly"; otherwise, Fartman does not share any phrases in common with Fred.

Defendant also directs the court's attention to several more subtle differences between the toys. Defendant contends, for example, that " Fartman has eyes with solid retinas; Fred has eyes

23

with annular retinas.... Fartman's nose has no nostrils; Fred's nose has conspicuous large nostrils."

Notwithstanding these differences, the court concludes that, if confronted with both Fred and Fartman, "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." Wildlife Express Corp., 18 F.3d at 509 (quoting Peter Pan Fabrics, Inc., 274 F.2d at 489). Whatever differences exist between Fred and Fartman are insignificant in the overall artistic expression of the toys. See Wildlife Express Corp., 18 F.3d at 511. Of course, neither exact reproduction nor near identity is necessary to establish copyright infringement. Atari, 672 F.2d at 618.

This conclusion is reinforced in the instant case by the inescapable fact that the consumer audience seeking to buy an off-color toy like Fred or Fartman would not be particularly concerned with minor differences in appearance or fabric. See id. at 618 ("Video games, unlike an artist's painting or even other audiovisual works, appeal to an audience that is fairly undiscriminating insofar as their concern about more subtle differences in artistic expression").

Having determined that defendant had access to Fred, and that Fred and Fartman are substantially similar, the court concludes that plaintiff has met its burden of establishing an inference that defendant copied plaintiff's product. Further, defendant has failed to rebut this inference by demonstrating independent creation by either Burkhart or Gtig.

First, defendant has not identified any other toy in the public domain that it could have copied, and the striking similarities between the two dolls belie defendant's contention that Fartman was independently created. See Susan Wakeen Doll Co., 272 F.3d 441, 450 (internal quotations omitted) ("The more a work is both like an already copyrighted work and ... unlike

anything that is in the public domain, the less likely it is to be an independent creation."). Further, Green admitted at his deposition that his "idea" for Fartman, which he then communicated to Burkhart, was based on Fred. Although Fartman's manufacturer may not have had direct access to a Fred doll, defendant acknowledges that "Gtig supplied the Fartman plush toys based on a 2-dimensional drawing by [Burkhart]" - a drawing that had been authored at Green's direction and then edited by him after he decided to base the toy on Fred. The evidence in the instant case points to only one reasonable conclusion: that defendant copied Fred.

### CONCLUSION

Because plaintiff has demonstrated that no triable issue of fact exists with respect to the validity of its copyright and defendant's copying of Fred, the court grants plaintiff's motion for summary judgment of copyright infringement. The parties are directed to report for a status hearing on November 6, 2003, at 9:00 a.m.

**ENTER:**     **October 30, 2003**

Robert W. Gettleman
United States District Judge



FRED





FARTMAN



FARTBOY